UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| BIO-MEDICAL APPLICATIONS OF KENTUCKY, INC., | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 08-80-ART |
| v. | ) ) | **MEMORANDUM OPINION &** |
| COAL EXCLUSIVE CO., LLC., | ) ) | **ORDER** |
| Defendant/Third-Party Plaintiff, | ) ) | |
| v. | ) ) | |
| TIM DAVIS & ASSOCIATES, INC. | ) ) | |
| Third-Party Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

For the final years of her life, Glenna Booth depended on life-sustaining dialysis treatments. She received these treatments from the plaintiff healthcare provider Bio-Medical Applications of Kentucky ("BMA"). BMA in turn billed Ms. Booth's employee welfare benefit plan, Coal Exclusive Benefits ("CEB"), for the costs of those services. But CEB refused to reimburse BMA at its requested rate. BMA claims that the defendants CEB and CEB's third-party administrator, Tim Davis & Associates, improperly refused to pay Ms. Booth's medical benefits and breached their fiduciary duties to participants in an ERISA-covered group health plan. Now before the Court are cross-motions for judgment on the administrative record by BMA, R. 105, CEB, R. 101, and Tim Davis & Associates, R. 100. For the following reasons, the Court remands this action to the Plan Administrator, CEB.

# BACKGROUND

CEB is a Kentucky limited liability company that sponsored a self-funded, employee welfare benefit plan ("Plan"). AR-000198. This Plan provided healthcare benefits to the employees of a number of related companies, including the Long Fork Development Company, Inc. *Id*. Ms. Booth's husband worked for Long Fork, and, as the wife of an employee, she received coverage under the Plan. *Id*. In June 2002 doctors diagnosed Ms. Booth with end-stage renal disease. AR-000199. She soon thereafter began dialysis treatments provided by BMA and continued to receive treatments through at least 2006. *Id*., AR-000282.

While CEB ultimately retained responsibility for the Plan's operation, the Plan permitted CEB to delegate certain duties, such as administrative tasks, to a third-party administrator. *See* AR-000005–06. From 1992 to April 2003, CEB contracted with PICA Group Services to serve as the Plan's third-party administrator. AR-000198. Two other companies also served as third-party administrators for CEB—Global Risk Management beginning in 2002 and Tim Davis & Associates beginning in 2003. *Id*., AR-000199, AR-000282. At the time Ms. Booth started her dialysis treatments, PICA still acted as CEB's third-party administrator.

In September 2002, PICA contacted CEB to discuss BMA's charges for Ms. Booth's dialysis treatments. According to PICA, the charges for her treatments exceeded the amounts allowable by the Plan for treatment. AR-000199. The Plan only covered medical treatments if they satisfied the "usual, customary and reasonable" ("UCR") fee definition. AR-000025, AR-000031–32, AR-00099, AR-000190, AR-000195–96. PICA recommended that CEB engage an outside company, Innovative Health Strategies, to review BMA's claims and "reprice" them as

2

necessary.  AR-000199.  CEB agreed with PICA's recommendation, and Innovative Health Strategies undertook a review of BMA's claims.  *Id*.  CEB subsequently determined that it would pay only the UCR rates as determined by Innovative Health Strategies—an amount below that claimed by BMA.

After Tim Davis & Associates became the third-party administrator, it, too, sought Innovative Health Strategies' repricing services.  AR-000282.  Innovative Health Strategies, however, responded that it could no longer perform repricing for CEB.  *Id*.  So Tim Davis, of Tim Davis & Associates, joined with two other individuals—Ronald Faulkner and Jerry Deom—to form Medical Case Management, LLC, to provide the repricing services formerly performed by Innovative Health Strategies.  AR-000281–82.  Despite his role as an owner of Medical Case Management, Tim Davis maintains he had no involvement in the company's daily operations, including its repricing activities.  AR-000282–83.  Medical Case Management then picked up where Innovative Health Strategies left off and began repricing BMA's claims.

On February 9, 2007, CEB contacted Ms. Booth to inform her that, because an adverse benefit determination had been made, her claims for BMA's treatment would be paid at a reduced rate.[1]  AR-000194.  In addition to asserting that BMA's charges exceeded the UCR amount allowed by the Plan, CEB also claims that BMA's charges included other billing irregularities pertaining to the bundling of charges and the improper coding of items on BMA's bills.  AR-000286, AR-000412.  Ms. Booth appealed the adverse benefit decision on February

---

[1]  CEB admits that Ms. Booth did not receive an adverse benefit determination letter informing her of her right to appeal until after her attorney notified CEB of this fact in 2006.  R. 113 at 2.

3

28, 2007. AR-000427–437. On October 19, 2007, the CEB Appeals Committee informed Ms. Booth that her appeal had been denied. AR-000001–02. BMA subsequently filed this action on April 21, 2008. R. 1. The Court dismissed Ms. Booth as a plaintiff on March 25, 2009, R. 53, because she was deceased at the time of filing and had already assigned her claim to BMA. The remaining parties' cross motions for judgment on the administrative record—BMA, CEB, and Tim Davis & Associates—are now before the Court.

## DISCUSSION

### 1. Standard of Review

Courts adjudicating ERISA claims generally do not use the summary judgment mechanism. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring). Instead, courts conduct their review "based solely upon the administrative record" and consider the evidence that was before the plan administrator—in this case, CEB. *Id.* As the parties initially stipulated, R. 58, the Court reviews CEB's decision under an arbitrary and capricious standard because the governing documents, AR-000003-79; AR-000080-124; AR-000125-189, conferred discretion on CEB to interpret the Plan. *Cooper v. Life Ins. Co. N. Am.*, 486 F.3d 157, 164-65 (6th Cir. 2007) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). Under this standard, a plan administrator's decision will be upheld so long as it is "the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 501 (6th Cir. 2010) (quoting *Baker v. United Mine Workers of Am. Health & Ret. Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991)).

BMA no longer stipulates to the deferential arbitrary and capricious standard of review. It first says that the Court should apply *de novo* review because the body who made the decision the Court is now reviewing—the Appeals Committee—suffered a conflict of interest. CEB acknowledges a structural conflict of interest existed because it both decided eligibility for and paid benefits. R. 101, Attach. 1 at 16. It nevertheless maintains that this conflict had no bearing on the Appeals Committee's decision. Regardless, the existence of a conflict of interest does not alter the standard of review. *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2351-52 (2008). Rather, it serves as a factor in deciding whether the Appeals Committee's decision was arbitrary and capricious. *Id.*

BMA also says that procedural errors committed by CEB provide another ground for employing a *de novo* standard of review. But in the Sixth Circuit procedural errors do not convert the standard of review from arbitrary and capricious to *de novo*. *Spectrum Health, Inc. v. Good Samaritan Employers Ass'n, Inc. Trust Fund*, No. 1:08-CV-182, 2008 WL 5216025, at *6 (W.D. Mich. Dec. 11, 2008) ("The Sixth Circuit has never subjected a claim to *de novo* review on the basis of procedural error."). Where they do matter, however, is in deciding whether the decision to partially deny benefits was arbitrary and capricious and whether to remand this action to CEB.

Finally, BMA contends that *de novo* review should apply because the Appeals Committee's decision was unduly delayed. Yet the one case it relies on, *Soltysiak v. UNUM Provident Corp.*, 531 F. Supp. 2d 816, 818 (W.D. Mich. 2008), involved a plan administrator who failed to make a decision at all, with the result that the claim was "deemed denied" and the

"decision" ripe for judicial review. *See also Kolpacke v. CSX Pension Plan*, 554 F. Supp. 2d 733, 739 (E.D. Mich. 2007) (concluding that defendant "substantially complied with the procedural requirements" of ERISA when it issued denial notice 17 days after the deadline and declining to employ a *de novo* standard of review). In this case, the Appeals Committee eventually issued a decision. What's more, the delay was apparently the result of on-going settlement negotiations and a mediation that took place between the parties during that time. R. 120 at 7-8. Also, the only information submitted by BMA to the administrative record is a letter dated August 24, 2007, *see* AR-000423—a date after which BMA claims the Appeals Committee should have issued its decision. R. 107 at 11. In any event, like in *Soltysiak*, 531 F. Supp. 2d at 820, the Court need not determine whether the standard of review must be heightened under such a circumstance because CEB's decision does not withstand even arbitrary and capricious review.

## 2. Review of Plan Administrator's Decision

The Court must remand this case because CEB abused its discretion—that is, several procedural errors and gaps in the administrative record make it impossible for the Court to conclude that CEB's decision is the result of a deliberate, principled reasoning process and is supported by substantial evidence**.** *See Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 373 (6th Cir. 2009) (procedural errors are bases for remanding to a plan administrator); *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 622 (6th Cir. 2006) (concluding that where the problem is with the integrity of the decision-making process rather than a claimant being denied benefits to which he is clearly entitled, remand is appropriate). While the arbitrary

6

and capricious standard of review is highly deferential, it "does not require [the Court] to merely rubber stamp the administrator's decision." *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citation omitted).

## A. Procedural Errors

To ensure a deliberate, principled reasoning process, ERISA requires plan administrators to abide by several procedures. 29 U.S.C. § 1133. First, a claimant must be given an opportunity for "a full and fair review of the claim and the adverse benefit determination." 29 C.F.R. § 2560.503-1(h)(1). Second, the review must be conducted by "an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual." *Id*. § 2560.503-1(h)(3)(ii).

To begin, it is not entirely clear that the Appeals Committee who reviewed Ms. Booth's adverse benefits decision was composed of individuals who neither "made the adverse benefit determination," nor were "subordinate[s] of such individual." 29 C.F.R. § 2560.503-1(h)(3)(ii). The following individuals composed the Committee: Craig Preece, the Chief Financial Officer for CEB; Marty Sloan, the safety director of a CEB-affiliated company; and Stephanie Penniston, the legal secretary of Rebecca Gohman, CEB's general counsel. R. 101, Attach. 1 at 8. Angela Fraley, the Benefits Director of CEB, removed herself from the Appeals Committee before the review. R. 105, Attach. 1 at 23-24. Each of these individuals was an employee of CEB or a CEB-affiliated company. And each of them was a subordinate of CEB-majority-owner James Booth, who was also the very individual who signed the original adverse benefit decision under

7

review by the panel.

To be sure, things are not clear cut. Angela Fraley states in her affidavit—which is properly before the Court on this procedural question, *Wilkins*, 150 F.3d at 619 (Gilman, J., concurring) ("The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part.")—that while James Booth signed the adverse benefit determination dated February 9, 2007, he played no role in the decision-making process. *Id.* Fraley claims she, not James Booth, affirmed the decision of the repricer to deny the claims to the extent they exceeded the UCR amount. R. 101, Attach. 3 at 2; *see Rose v. Meijer Long-Term Disability Plan*, No. 1:05-CV-713, 2007 WL 187698, at *5 (W.D. Mich. Jan. 22, 2007) (allowing introduction of affidavits to show that employee who signed both the initial adverse benefit determination letter and the appeal denial letter did not actually review the appeal and noting that the plaintiff offered no evidence to contradict the affidavits). And BMA has presented no evidence, outside of James Booth's signature on the denial letter, that he made the initial decision. Indeed, Fraley's recusal from the Appeals Committee also supports this contention. Even with Fraley's affidavit, however, the composition of the Appeals Committee is a source of discomfort. It may not be enough alone to support remand. But the lack of clarity in the record on this point—which might be remedied by making Angela Fraley available to BMA for questioning—gets CEB off to a rocky start.

## B. Pricing Methodology

A more serious procedural error lies with the Appeals Committee's rendering a decision affirming that BMA's prices were too high without providing BMA access to the data CEB used to determine the UCR rate. For more than six years, BMA apparently requested and was denied access to any of the data actually used to calculate UCR rates payable under the Plan. R. 105, Attach. 1 at 28. For example, contrary to CEB's claim, R. 113 at 36, 42, BMA requested the sources and documentation CEB used to determine UCR amounts in 2004, R. 105, Attach. 47 at 4-5, and CEB responded only with information describing in general the methodology used by its repricers, *id*. at 8-9. Similarly, BMA requested this information once again in 2007, asking to see the precise methodology used by the Plan in determining UCR rates. *Id*. at 27; *see also Wilkins*, 150 F.3d at 619 (Gilman, J., concurring) (stating that documents not in the administrative record are appropriately considered for procedural challenges). Further, BMA's letter included in the administrative record once more reiterated that CEB never provided information on how it calculated the UCR amounts for Ms. Booth's services. AR-000423.

As the court held in *Spectrum Health, Inc. v. Good Samaritan Employers Association, Inc. Trust Fund*, 2008 WL 5216025, at *2, this refusal to hand over pricing methodology is a procedural error. There, the administrator of an employee benefit plan sent the medical provider a notice of adverse benefit determination explaining why it rejected each charge. That notice described its use of sources such as Red Book, the American Hospital Directory, and the Physicians' Fee Reference in calculating reasonable and customary charges. *Id*. Instead of offering this information to the provider, it stated that most providers have access to these

sources of information, and, if not, they can be purchased in the market place. *Id*. Yet even with this disclosure the court held that the failure to provide this information upon request contravened 29 C.F.R. § 2560.503-1(h)(2)(iii). *Id*. at *4. This point was particularly important because, as here, the appeal rested on the claim that the administrator's determination of reasonable and customary charges did not comply with the plan language. Also, the failure of the provider to supply rebuttal evidence did not defeat its claim for benefits—the provider could not challenge the administrator's reliance on those sources without access to the sources themselves. *Id*. Here, BMA, like the plaintiff in *Spectrum*, lacked the specific information to make a meaningful challenge to CEB's partial denial of benefits.

BMA's right to access to the CEB's pricing methodology is all the stronger in the wake of Pension and Welfare Benefits Administration Opinion Letter 96-14A. R. 105, Attach. 6. According to the opinion, for purposes of sections 104(b)(2) and 104(b)(4)—provisions setting forth what a plan administrator must make available to a beneficiary upon written request—any document or instrument that specifies procedures, formulas, methodologies, or schedules to be applied in calculating a beneficiary's benefit entitlement constitute instruments under which the plan is operated and should be provided to the beneficiary upon request. *Id*. at 2-3. The schedule of usual and customary fees used to calculate benefits in that case qualified as an instrument under which the plan operated, meaning it should have been disclosed to the beneficiary. By failing to give BMA the opportunity to secure this information before rendering its decision, CEB committed a procedural error. CEB should provide BMA with this

information on remand.[2]

### 3. Claims for Benefits

On top of the procedural problems in this matter, CEB's decision is substantively arbitrary and capricious. That is, CEB's conclusion that BMA's charges were excessive when compared with the UCR rate, AR-000001-02, turned on a calculation of the UCR rate that did not conform with the text of the plan. *See Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1374 (6th Cir. 1994) (holding that the language of the written instrument is the starting point in this analysis).

Three Plans governed Ms. Booth's claims. Each of the three Plans instruct the administrator to evaluate BMA's charges according to the UCR fee standard—and each of the three Plans give specific instructions on what to consider in calculating that fee. Yet, the administrative record lacks evidence showing that this evaluation occurred, and as a result, CEB's decision to partially deny benefits was arbitrary and capricious.

**2001-2003 Plan**

The 2001-2003 Plan defines the Usual, Customary and Reasonable Fee according to the "lesser of the (1) usual fee—the charge most frequently made for the covered services or supplies

---

[2] BMA makes several other meritless challenges to CEB's decision-making process. For example, BMA contends that a number of relevant documents in CEB's possession were not placed before the Appeals Committee. R. 105, Attach. 1 at 24. These documents include BMA's claims (what it refers to as UB-92s), Explanation of Benefits ("EOB") issued by Global Risk Management and Tim Davis & Associates, and handwritten repriced claims. *Id*. But it is unclear how these documents would have assisted the Appeals Committee. Similarly, BMA contention that the Appeals Committee was an unauthorized body under the Plan lacks support. The Plan documents do in fact provide for an appeals process, *see* AR-000073, AR-000121, AR-000173, and BMA has not shown how the creation of the Appeals Committee violated ERISA regulations.

by a physician, hospital, or other eligible medical provider; (2) the customary fee—the charge made for covered services or supplies by those of similar professional standing in the same geographic area; (3) the reasonable fee—the charge determined by considering the complexity involved, the degree of professional skill required and other pertinent factors, if (1) and (2) above cannot be easily determined." AR-000025. The Plan also states that certain limitations and exclusions apply to expenses incurred by all covered persons. AR-000047. One such exclusion is charges in excess of the reasonable and customary amount. AR-000048.

Even though the Plan only allows for option three if the first two options cannot be easily determined, Medical Case Management appears to have jumped straight to option three. AR-000001-02. For example, nothing in the record indicates any efforts were made to determine the customary fee (option two)—the charge made for covered services or supplies by those of similar professional standing in the same geographic area. And even now CEB cannot supply that data: In its response to BMA's motion for judgment, CEB merely states that the repricers used data systems "based upon charges by providers." R. 113 at 25. The question remains: Which providers? What geographic area did Medical Case Management consider? What did those providers charge and how did BMA's charges compare? And even assuming determining the UCR under option three—the reasonable fee—was permissible, CEB does not explain how its UCR determination accounted for the "complexity involved" or "professional skill required" to provide Ms. Booth's treatment.

It is true that Innovative Health Strategies, who performed repricing services for CEB *before* Medical Case Management, noted in a 2004 letter submitted for the administrative record

that data comparisons are typically limited to a particular geographic area and may extend beyond that area when there is an inadequate representation of charges in a particular area. AR-000422. But Medical Case Management co-founder Jerry Deom's affidavit also in the record makes no mention of such efforts. His explanation relied on the average wholesale prices of the drugs. The record contains no other indication of what the customary fee might have been for the geographic area where Ms. Booth received treatment or that any efforts were made to determine that figure.

CEB responds that BMA failed to submit information about its charges, forcing CEB to look to outside sources, including information from national databases from providers throughout the country. But BMA did not bear responsibility for ascertaining customary charges in the geographic area—it was CEB's responsibility. CEB relied on an exclusion to justify paying Ms. Booth's claims at a lower rate, and the burden of proving an exclusion applies rests with CEB. *See Spectrum Health*, 2008 WL 5216025, at *7; *Caffey v. UNUM Life Ins. Co. of Am.*, No. 95-6373, 1997 WL 49128, at *3 (6th Cir. Feb. 3, 1997) (citing *Farley v. Benefit Trust Life Ins. Co.*, 979 F.2d 653, 658 (8th Cir.1992)) ("[A]ccording to common law trust principles, the administrator of an ERISA-regulated plan has the burden to prove exclusions from coverage."). CEB has not met that burden with respect to the 2001-2003 Plan. In the end, CEB's decision to partially deny BMA's claims under the 2001-2003 Plan did not comport with the Plan language.

**2003-2004 Plan**

The 2003-2004 Plan defines the Reasonable and Customary Charge as "the amount

normally charged by the provider for similar services and supplies" and that does "not exceed the amount ordinarily charged by most providers of comparable services and supplies in the locality where the services or supplies are received." AR-000099. Yet the record contains no information on the amount charged by "most providers of comparable services and supplies in the locality." While the repricers may have considered this information in making their determination, the record does not reveal it.

CEB might reply that the same Plan also says that a "table" may be used to determine the rate. R. 113 at 32. But that does not mean the Plan language requiring information about the charges by local providers could be disregarded. Nor does the use of a table imply rates will be determined according to the Average Wholesale Price. Based on the information in the administrative record, CEB failed to follow the 2003-2004 Plan language.

**2004-2005 Plan**

Finally, the 2004-2005 Plan defines the Usual and Reasonable Charge as the "charge which is not higher than the usual charge made by the provider of the care or supply and does not exceed the usual charge made by most providers of like service in the same area. . . . The Plan Administrator has the discretionary authority to decide whether a charge is Usual and Reasonable." AR-000159. This Plan goes further by including a provision granting the Plan Administrator the "maximum legal discretionary authority to construe and interpret the terms and provisions of the Plan, to make determinations regarding issues which relate to eligibility for benefits, [and] to decide disputes which may arise relative to a Plan Participant's rights[.]" AR-000183. An amendment to this Plan on January 1, 2005, included language granting the Plan

14

Administrator the express authority to engage outside consultants in assisting the Plan Administrator in determining whether a particular charge is in excess of the UCR amount.[3] AR-000190.

Of the three, this Plan grants the administrator the greatest discretion to determine whether a charge equals the UCR rate. The Plan language, nevertheless, refers to the "usual charge made by most providers of like service in the same area."

CEB's repricers, however, used an entirely different metric. Jerry Deom, a founder of Medical Case Management, explained that it determined UCR rates based on a drug's Average Wholesale Price ("AWP"). AR-000412, ¶¶ 6-7. Deom clarified that "AWP is the base price from which purchasers receive a percentage discount from wholesalers." *Id*. He stated that pharmacies receive approximately a 20% discount from the AWP. *Id*. Deom then described how Medical Case Management determined the proper UCR rate. First, it looked to sources such as Medispan, Red Book, and First Data Bank in establishing the AWP. After determining the AWP, it deducted approximately 20% to calculate a reasonable actual cost of Epogen to BMA—approximate due to the ongoing wholesaler price fluctuations. *Id*. Finally, it multiplied

---

[3] The amendment reads: Usual, Reasonable and Customary Charge (Usual, Reasonable and Customary or URC) means the lesser of: (1) the billed charge, or (2) the average of the fees routinely billed or accepted as reimbursement by the provider for the same service or supply (regardless of payor source), or (3) the average of the fees routinely billed or accepted as reimbursement by other providers in the locality for the same or a comparable service or supply (regardless of payor source). "Locality" shall mean a geographic area of sufficient size so as to include the provider in question and other competing providers offering the same or substantially similar services. The size of a particular locality in any given instance shall fall within the discretion of the Plan Administrator or its designee. The Plan Administrator shall retain discretionary authority to determine whether a charge is Usual, Reasonable and Customary, and may engage outside consultants to assist the Plan Administrator in determining whether a particular charge is in excess of Usual, Reasonable and Customary Charges for a particular service or supply. (AR-000190).

the reasonable cost by an additional profit margin of 10%.  *Id*.  Deom further explained by way

of example: "[I]f BMA charged $100 for a unit of Epogen, [Medical Case Management] would

determine the AWP to be $10.  The minimum discount off of AWP is 20%, so the reasonable

cost would be $8 per unit.  [Medical Case Management] determined the allowable charge to be

$8.80 ((AWP – 20%)+ 10% profit)."  *Id*.

Nothing in any of the Plans explicitly prohibits using repricers.  However, only the 2004-

2005 Plan included language expressly allowing for them.  AR-000190.  As for the methodology,

BMA contends the Plan did not allow for the use of proprietary fee schedules used by Medical

Case Management.  R. 105, Attach. 1 at 28.  In general, ERISA regulations do not prohibit the

use of such sources.  *See e.g., Catholic Healthcare West-Bay Area v. Seafarers Health & Benefits*

*Plan*, No. C 06-1741, 2007 WL 160995, at *6 (N.D. Cal. Jan. 18, 2007) *reversed on other*

*grounds by Catholic Healthcare West-Bay Area v. Seafarers Health & Benefits Plan*, 321 F.

App'x 563, 565 (9th Cir. 2008) (holding that plaintiff could not show that plan's reliance on Red

book and Ingenix methodologies was unreasonable or in bad faith); *Krauss v. Oxford Health*

*Plans, Inc*., 418 F. Supp. 2d 416, 428-29 (S.D.N.Y. 2005) (approving of Ingenix as a database

for determining UCR where plan permitted it).

The real problem with methodology used here is that it determines the UCR rate by

reference to the *cost* to the provider of the services, whereas the Plan requires determining the

UCR rate by reference to the *charges* of the provider.  R. 105, Attach. 1 at 29.  After January 1,

2005, the Plan considered the average reimbursement accepted by the provider.  *Id*.  But the

costs of providing services do not necessarily equal the charges or reimbursement accepted by

the provider.  *See Schwartz v. Oxford Health Plans*, 175 F. Supp. 2d 581, 591-92 (S.D.N.Y. 2001) (holding that use of wholesale prices was inappropriate where beneficiary purchased medication at retail, not wholesale, rates and the plan handbook did not support using the wholesale price).  Likewise, in *Spectrum*, the court held that the plan required that the UCR rate be determined by considering other provider's charges, not costs.  *Spectrum Health*, 2008 WL 5216025, at *9.  As a result, the plan's use of wholesale or list prices to determine the UCR rate violated the plan.  Here, CEB's reliance on this methodology did not comport with Plan language, and its subsequent decision to partially deny benefits was arbitrary and capricious.[4]

### 4. Remand

Despite these procedural and substantive errors, BMA maintains that remanding this action to the Appeals Committee is an inappropriate remedy because it considers CEB and the Appeals Committee to be biased decision-makers.  R. 105, Attach. 1 at 36.  While a remand may be inappropriate in some cases when it would send the message that a "plan administrator may deny claims in a piecemeal fashion, testing each potential basis for denying a claim at separate points in the proceedings," *see Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 375 n.8 (6th Cir. 2009), a remand is appropriate here.  This is especially so because

---

[4] CEB also revealed during discovery that it used a source known as Ingenix.  Ingenix is a data source containing the retail, not wholesale, amounts billed to consumers by local providers for covered services.  *Krauss*, 418 F. Supp. 2d at 428.  CEB says Ingenix was used to price some of the charges, amounting to 20% or less of the total charges.  R. 113 at 25.  In *Krauss v. Oxford Health Plans*, the court upheld the use of Ingenix as a database, noting that the plan language permitted the use of Ingenix (formerly known as the Health Insurance Association of America).  418 F. Supp. 2d at 428.  Here, nothing in the Plan language expressly allowed for the use of Ingenix.  Also, the administrative record before the Appeals Committee makes no mention of this source.

the plan administrator's decision suffers from a procedural defect, the administrative record is factually incomplete, *id*. at 373, and the plan administrator "fail[ed] . . . to explain adequately the grounds of [its] decision." *Id*. (quoting *Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1288 (10th Cir. 2002)); *see also Miller v. United Welfare Fund*, 72 F.3d 1066, 1073-74 (2d Cir. 1995) (finding that the trustee's decision was arbitrary and capricious but remanding to the fund because the court did "not conclude that [the plaintiff's] claim necessarily should have been granted because [the court did] not find that, upon the receipt of additional evidence, a reasonable fiduciary could only have granted the claim").

Ultimately, a remand is needed here to ensure a "full and fair review" in this case. *Shelby Cnty.*, 581 F3d at 373 (citing *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 240 (4th Cir. 2008)). Without evidence of the charges of other providers in the geographic area, a factually incomplete record exists on which to make a decision about awarding of benefits to BMA. Also, because CEB failed to provide BMA with the precise methodology on how Ms. Booth's claims were repriced, BMA lacked the information to directly challenge CEB's conclusions. Finally, the repricers relied on AWP in determining the proper UCR rate as opposed to charges as required by the Plan, further calling into question CEB's decision to partially deny benefits.

On remand, CEB should provide BMA with the precise methodology and information used to determine Ms. Booth's claims. Also, CEB should supplement the record with information on how the repricers determined the UCR rate, including its comparisons with the charges of local providers where applicable. And it should make clear who was responsible for

each decision. Both parties should take special care in adhering to applicable ERISA timelines for providing information and submitting materials to the administrative record.

### 5. Other Claims

BMA also moves for summary judgment against CEB and Tim Davis & Associates on the grounds that both parties breached their fiduciary duties to the Plan. It would be premature to make this determination before remanding the action to CEB. It may be that, after the record is more fully developed, the savings to the Plan from hiring the repricers will be apparent. Or the record may reveal the opposite.[5] For this reason, the Court denies this motion without prejudice. BMA also contends it is entitled to statutory penalties for CEB's failure to provide it with notice of overpayment by CEB or the precise methodology and information used by the repricers. The Court, likewise, declines to rule on this issue at this time. In any future submissions to the Court, BMA should include specific dates for which BMA claims it is entitled to penalties, as well as any relevant Plan provisions, statutes, or regulations supporting its claim. Next, BMA moves for summary judgment on CEB's claims for reimbursement. Because the UCR rate under the Plan remains in controversy, this issue is more appropriate for consideration once the record has been more fully developed and that amount determined. Finally, BMA "requests leave to file a motion to recover costs and attorney's fees pursuant to ERISA's fee recovery provision." R. 105, Attach. 1 at 49. A plaintiff need not prevail in a claim for benefits

---

[5] While not part of the administrative record and not relevant to this Court's determination that the decision not to award benefits was arbitrary and capricious, BMA states that the Plan paid $414,501.64 to MCM for its services in repricing BMA's claims, whereas it only paid BMA $178,445.49 for providing Ms. Booth's treatments. R. 105, Attach. 1 at 42.

to obtain attorney's fees.  *See First Trust Corp. v. Bryant*, 410 F.3d 842, 851 (6th Cir. 2005) ("This Court has rejected a presumption that attorney's fees should ordinarily be awarded to the prevailing plaintiff.").  BMA should keep in mind factors the Court will consider in evaluating a claim for fees.  Those include: "(1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions."  *Gaeth v. Hartford Life Ins. Co.*, 538 F.3d 524, 529 (6th Cir. 2008) (citing *Sec'y of the Dep't of Labor v. King*, 775 F.2d 666 (6th Cir. 1985)).  Therefore, if BMA chooses to submit a request for fees and costs it shall do so no later than March 28, 2011.

## CONCLUSION

The administrative record on which the Appeals Committee based its decision leaves unanswered questions and an incomplete factual record.  The decision to partially deny BMA's claims for reimbursement was, therefore, arbitrary and capricious.  A remand is appropriate in this action so that CEB may provide BMA with the precise methodology on how Ms. Booth's claims were processed.  CEB should also explain for the record any efforts to ascertain the charges of local providers in determining the correct UCR rate to be applied to BMA's claims.

Accordingly, it is **ORDERED** that:

(1)      CEB's motion for judgment, R. 101, is **DENIED WITHOUT PREJUDICE**;

(2)      Tim Davis & Associates's motion for judgment, R. 100, is **DENIED WITHOUT**

**PREJUDICE**;

(3)     BMA's motions for judgment, R.102 and R. 105, are **DENIED WITHOUT PREJUDICE**;

(4)     This action is **REMANDED** to CEB for further action consistent with this opinion.

(5)     If BMA chooses to submit an application for fees and costs it must do so no later than **March 28, 2011**.

This the 2nd day of March, 2011.

Signed By:

_**Amul R. Thapar**_ AT

**United States District Judge**