| | |
|---|---|
| BIO-MEDICAL APPLICATIONS OF KENTUCKY, INC., | ) ) ) |
| Plaintiff, | ) ) Civil No. 08-80-ART |
| v. | ) ) |
| COAL EXCLUSIVE CO., LLC, | ) **MEMORANDUM OPINION** ) **& ORDER** |
| Defendant/Third-Party Plaintiff, | ) ) |
| v. | ) ) |
| TIM DAVIS & ASSOCIATES, INC., | ) ) |
| Third-Party Defendant. | ) ) |

*** *** *** ***

A party need not "win" to receive attorney's fees in an ERISA action. In fact, this case has yet to produce a definitive "winner." The Court recently remanded this action so that the defendant Coal Exclusive Co. ("CEB") could conduct a full and fair review of the plaintiff Bio-Medical Applications' ("BMA") claims for medical treatments provided to one of CEB's beneficiaries. BMA has nevertheless shown that it is entitled to an award of attorneys' fees at this juncture.

## I. BACKGROUND

This motion for attorneys' fees stems from the Court's prior consideration of the parties' cross-motions for summary judgment. R. 128. In its motion for summary judgment, BMA claimed that CEB improperly refused to pay the medical benefits of

one of CEB's beneficiaries, Glenna Booth. Ms. Booth was diagnosed with end-stage renal disease in June 2002. This condition required that she undergo dialysis treatments, which BMA provided. CEB, however, only partially reimbursed Ms. Booth's claims because it considered BMA's charges to be excessive and not supported by the Plan language. Ms. Booth eventually assigned her claims to BMA, leaving BMA and CEB to continue the fight. The CEB Appeals Committee eventually upheld the decision partially denying BMA's claims. Upon reviewing the administrative record, this Court concluded that CEB's decision was arbitrary and capricious. R. 128.

A number of problems plagued the administrative record and the review conducted by the CEB Appeals Committee. First, the composition of the Appeals Committee was problematic. Each of the individuals making up the Committee was employed by CEB or a CEB-affiliated company and therefore a subordinate of CEB-majority-owner James Booth—the very person who signed the initial adverse benefit decision letter (a procedural problem under 29 C.F.R. § 2560.503-1(h)(3)(ii)). Second, CEB's failure to provide BMA with access to the data CEB used to determine a figure known as the Plan's Usual, Customary and Reasonable ("UCR") rate presented an even more serious cause for concern. Third, the methodology CEB's auditors, or repricers, used to calculate the UCR rate was not supported by the Plan. And finally, because the Appeals Committee (and by extension, CBE) failed to follow the Plan language in reviewing BMA's claims, the Court determined that the decision partially denying benefits was arbitrary and capricious, supporting a remand to CEB for a full and fair review.

In its motion for summary judgment, BMA requested leave to file a motion to recover costs and attorneys' fees pursuant to ERISA's fee-recovery provision. R. 105-1 at 49. That motion is now ripe for consideration.

## II. DISCUSSION

Under 29 U.S.C. § 1132 (g)(1), a court may, in its discretion, allow reasonable attorneys' fees and costs in ERISA actions. A party need not prevail in a claim for benefits to obtain fees. *See First Trust Corp. v. Bryant*, 410 F.3d 842, 851 (6th Cir. 2005) ("This Court has rejected a presumption that attorney's fees should ordinarily be awarded to the prevailing plaintiff."). Rather, the party seeking attorneys' fees must achieve "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2158 (2010). This "success" must be more than "trivial" or a "purely procedural victory." *Id.* (citation omitted).

That is the situation here. BMA has not prevailed; yet it has still been successful in that it secured a remand to CEB for a full and fair review of its claims. True, a remand may result in either the approval or denial of benefits, and defining a remand as "success" could prove misleading. Nevertheless, courts have held that a remand under the right circumstances could still support a fee award. Indeed, in *Hardt*, the Supreme Court concluded that, even though the district court declined to award either party summary judgment and remanded the plaintiff's claim to the plan administrator, the plaintiff was nevertheless entitled to a fee award. *Id.* at 2159. The district court indicated that it had been inclined to rule in the plaintiff's favor but chose to allow the plan administrator one last chance to address the deficiencies in its review. *Id.* at 2158-59. In this respect, the plaintiff achieved more than a procedural

victory or trivial success.  The Court, however, declined to rule whether a remand order, without more, qualified as "success."  *Id*.

A similar fee question arose in *McKay v. Reliance Standard Life Ins. Co*., Nos. 10-5154, 10-5155, 2011 WL 2518728, at *9 (6th Cir. June 27, 2011), where the court agreed that the plaintiff achieved some success on the merits when his claim for disability benefits was remanded for further consideration.  In fact, this remand supported a fee award even though the court later upheld the denial of the plaintiff's benefits following the remand.  *Id*.  The court determined that the remand satisfied *Hardt*'s standard for "success."  *Id*.

Like the plaintiffs in *Hardt* and *McKay*, BMA achieved more than a procedural victory in securing a remand.  *Cf. McQueary v. Conway*, 614 F.3d 591, 601 (6th Cir. 2010) ("A procedural victory that may be a way station to utter substantive defeat creates no right to fees." (quoting *Richardson v. Penfold*, 900 F.2d 116, 119 (7th Cir. 1990))).  A procedural victory would have been a decision remanding BMA's claims based solely on problems with the composition of the Appeals Committee.  Instead, BMA succeeded in having this Court vacate the Appeals Committee decision in full.  Thus, on remand, BMA will receive a substantive look at its claims using the correct methodology and according to the requirements in the Plan language, something it did not receive during the first review.  This "success" is sufficient for purposes of an award.  Indeed, CEB did not even contest this point in its brief, but rather immediately proceeded to the next step for evaluating whether a party is entitled to fees.

Only after determining a party has achieved "some degree of success on the merits" may the Court turn to the five-factor test for awarding attorney's fees used by the Sixth Circuit. *Hardt*, 130 S. Ct. at 2158 n.8 ("We do not foreclose the possibility that once a claimant has satisfied this requirement, and thus becomes eligible for a fees award . . . a court may consider the five factors . . . ."). These factors include: "(1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of attorney's fees; (3) the deterrent effect of an award on other persons under similar circumstances; (4) whether the party requesting fees sought to confer a common benefit on all participants and beneficiaries of an ERISA plan or resolve significant legal questions regarding ERISA; and (5) the relative merits of the parties' positions." *Gaeth v. Hartford Life Ins. Co.*, 538 F.3d 524, 529 (6th Cir. 2008) (citing *Sec'y of the Dep't of Labor v. King*, 775 F.2d 666, 669-70 (6th Cir. 1985) (per curiam)). No single factor is dispositive since the factors themselves are not statutory. *Bryant*, 410 F.3d at 851. They instead represent a "flexible approach." *Id*.

***1. Culpability or Bad Faith.*** The first factor in weighing an award of attorneys' fees is whether the opposing party acted with culpability or in bad faith. *Gaeth*, 538 F.3d at 529. That CEB's decision was arbitrary and capricious does not automatically mean it acted with culpability or in bad faith. *Foltice*, 98 F.3d at 937. CEB emphasizes that its erroneous interpretation of the Plan language does not constitute bad faith for an award of attorney fees. R. 133 at 4. This is true. But bad faith and culpability are not one in the same. *Elliott V. Met. Life Ins. Co*., No. 04-174, 2007 WL 1558519, at *3 (E.D. Ky. May 29, 2007). Even though it did not act in bad

faith, the reasons for concluding CEB's decision was arbitrary and capricious also support the conclusion that it acted with culpability. *Gaeth*, 538 F.3d at 530 (citing *Moon v. Unum Provident Corp.*, 461 F.3d 639, 644-45 (6th Cir. 2006)).

Culpability (i.e., blame) has been found where a plan administrator terminated benefits based primarily on the opinions the company's own doctors, *Hoover v. Provident Life & Acc. Ins. Co.*, 290 F.3d 801, 809-10 (6th Cir. 2002); *Moon*, 461 F.3d 639 (6th Cir. 2006), and where a plan administrator terminated a plan participant's benefits without sufficient medical evidence of the participant's physical condition, *Gaeth*, 538 F.3d at 530-31. Here, CEB's review of BMA's claims included in the administrative record was likewise lacking. Three separate Plans governed those claims. While the Plans instructed the administrator to evaluate BMA's charges according to the UCR rate, the administrative record did not reflect that. Instead, the record revealed that the CEB's repricers used their own calculation method based on the *cost* to the provider of the services, whereas the Plan required determining the applicable UCR rate by reference to the *charges* of the provider. The repricers, and by extension, CEB and its Appeals Committee, also overlooked the requirement that pricing decisions should have taken into account the charges for similar services in the relevant geographic market. Although CEB noted in its motion for summary judgment that BMA failed in its duty to provide information about its "usual" charges for dialysis treatments—something BMA admits—this did not relieve CEB of its duty to conduct a review based on the Plan language.

Also, for six years BMA requested access to the data CEB used to determine the UCR rate and for six years CEB failed to fully provide that information. R. 105-1

at 28.  While CEB eventually explained the methodology used, it failed to provide the data it relied on, preventing BMA from making a fully-informed challenge.  It now appears that at least some of the data is unavailable due to certain repricers no longer being in business.  *See* R. 130.

Finally, while not part of the arbitrary and capricious determination, CEB's payment methods to its repricers also call into question its decision denying benefits.  CEB paid its repricers according to the amount they saved the Plan, thereby creating an incentive for the repricers to "price" the claims below BMA's charges.  One repricer received 35% of the difference between what BMA billed to the Plan and the UCR rate as determined by the repricer.  This formula led to CEB paying one repricer $414,501.64, while it paid BMA only $178,445.49 for Ms. Booth's actual treatments.  R. 105-1 at 42.  Even if the repricer helped the Plan achieve significant savings, the large discrepancy between the amounts paid for actual services compared with the amount paid to the repricers is highly questionable.  The CEB Appeals Committee made no mention of this factor in evaluating Ms. Booth's appeal.

In response, CEB likens its actions to those found in *Shelby County Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 378 (6th Cir. 2009).  There, the court held that a fee award was improper based the plan administrator's misreading of a plan provision.  This misreading did not constitute "culpable" conduct for purposes of awarding attorney's fees.  *Id*.  But no one has alleged CEB misread a plan provision.  Rather, CEB failed to follow the unambiguous language of the Plan.

In the end, the decision to remand was more than a "purely procedural victory."  *Hardt*, 130 S. Ct. at 2158.  The administrative record revealed serious

concerns with the manner in which BMA's claims were repriced and the review eventually conducted by the Appeals Committee. Whether BMA will ultimately be entitled to additional funds remains to be seen. What is clear is that BMA's claims were not paid as required based on Plan language, and the party with the responsibility to oversee this process, CEB, did not do so as directed by the Plan.

As a result, CEB acted with culpability and this factor weighs in favor of awarding BMA attorneys' fees.

*2. Opposing Party's Ability to Satisfy Award***.** The next factor considers the opposing party's ability to satisfy an award. The CEB Plan covers over 700 employees and pays over $6 million in benefits annually. CEB nevertheless claims it has no assets independent of the contributions made by the employers who sponsor the Plan and that an award of attorneys' fees will significantly decrease the Plan assets available to pay other participants' benefits and costs. R. 133 at 6; *see Hooper v. Adams*, No. 3:08-1121, 2010 WL 2505684, at *1 (M.D. Tenn. June 18, 2010) (concluding that whether an award of attorney fees would decrease a plan's assets to pay benefits to other participants constituted a legitimate concern). This is especially so, says CEB, in light of any payment the Plan may have to make on remand. R. 133 at 5-6.

The exact impact such an award would have on CEB remains unclear. CEB never explicitly said it could not satisfy an award. It may not be a large insurance company with unlimited assets as found in *Moon v. Unum Provident Corp*., 461 F.3d at 644, but it had the ability to pay one of the repricers $414,501.64—an amount greater than what BMA now seeks. Further, BMA points out that during the time

CEB repriced BMA's claims, the Plan reported claims totaling over $312,000 to its excess loss carrier. R. 132 at 6. But the Plan only paid claims totaling roughly $187,000—meaning the Plan incurred a net-zero balance for a period of time. *Id.*

Based on the information available, this factor could cut either way. It is typically not given the weight of the other factors. *Loan v. Prudential Ins. Co. of Am.*, --- F. Supp. 2d ---, No. 5:08-38, 2011 WL 1793389, at *3 (E.D. Ky. May 10, 2011). Nor will it prove dispositive when the remaining factors point the other way. *Firestone Tire & Rubber Co. v. Neusser*, 810 F.2d 550, 557-58 (6th Cir. 1987). The Court will therefore not weigh this factor in favor of either party.

*3. Deterrence.* Considering a fee award also requires looking at the deterrent effect of the award on other plan administrators under similar circumstances. *Foltice*, 98 F.3d at 937. But wait, says CEB: an award of attorneys' fees will serve no deterrent effect in this case because CEB no longer uses repricers or auditors. R. 133 at 2. It now uses Anthem Blue Cross Blue Shield to negotiate rates directly with providers, rendering the deterrent effect of an award moot.[1] *Id.* To be fair, different cases have looked at the deterrence question as it applies to other providers, as well as the party opposing fees. *Compare Gaeth*, 538 F.3d at 531 ("This court has consistently interpreted the deterrence factor as requiring consideration of a fee award's deterrent effect *on other plan administrators.*"), *with Hoover*, 290 F.3d at 809 (approving the district court's consideration of the deterrent effect on the opposing party and "other similarly situated defendants"). Acknowledging this discrepancy, the court in *Gaeth* made clear that courts should focus on the deterrent effect of an

---

[1] BMA challenges this fact, noting that CEB still uses repricers. R. 135 at 2.

award on *other* plan administrators. 538 F.3d at 532. Courts should also consider whether the facts of a case are "so unique" that they would fail to serve any deterrent value on others or whether the principles articulated by the court are the type all plan administrators should follow. *Id.* at 531 (quoting *Moon*, 461 F.3d at 645).

This case simply did not present a factual scenario so unique or novel that awarding fees would carry no deterrent value. Here, CEB failed to link its ultimate determination to the language in the Plan while using an improper measure for calculating benefits—something all plan administrators should keep in mind when reviewing claims. Because an award here would provide a deterrent effect on other plan administrators, this factor weighs in favor of an award.

*4. Common Benefit.* The fourth factor in the fee analysis looks at whether the party requesting fees, BMA, sought to confer a common benefit on all Plan participants or resolve a significant ERISA legal question. *King*, 775 F.2d at 669-70. A deterrent effect on other plan administrators, standing alone, will not suffice as a common benefit for purposes of this factor. *Gaeth*, 538 F.3d at 533. Nor will a plan participant seeking benefits only for himself. *Id.* This factor ultimately weighs against BMA.

The main thrust of BMA's challenge was to secure benefits for itself. True, BMA also included a breach of fiduciary duty claim against CEB and one of its third-party administrators, Tim Davis & Associates. Further, it sought statutory penalties against CEB for failing to timely file certain forms. R. 105 at 43-44. The Court declined to rule on those particular claims prior to remand and denied both without prejudice. R. 128 at 19. Although these claims would have conferred a common

benefit on the Plan, a decision awarding benefits would clearly only benefit BMA. *See Everidge v. Irotas Mfg. Co., LLC*, No. 09-45, 2010 WL 5301000, at *3 (E.D. Ky. Dec. 17, 2010) ("While the Plaintiffs' breach-of-fiduciary-duty claim helped the plan as a whole, their § 1132(a)(1)(B) claims obviously benefit only particular participants. An award of attorney's fees from the Plan's assets actually harms other participants."). And nothing indicates that BMA's purpose in bringing suit was to benefit other Plan participants or that BMA relied on fee-shifting for pursuing its challenge. *See Armistead v. Vernitron Corp*., 944 F.2d 1287, 1305 (6th Cir. 1991) ("We might conclude that fee awards are proper when . . . there is litigation to establish the rights of a class of plaintiffs under an ERISA-protected plan and the economic situation of the plaintiffs is such that they could not bring suit except for the prospect of fee-shifting."). In fact, according to BMA, only $4,895.89 of the $420,189.26 in income generated by one of CEB's repricers during its four-year existence originated from a provider other than BMA. R. 105-1 at 4. This indicates that few, if any, providers were similarly situated to BMA or that BMA intended to assist other Plan participants in its challenge. Thus, it does not appear BMA sought to confer a common benefit in bringing this challenge.

Nor did BMA seek to resolve a significant legal question in its challenge. The underlying dispute considered whether CEB's decision partially denying BMA's claims was arbitrary and capricious—"a legal standard that has been analyzed repeatedly" by the Sixth Circuit. *Gaeth*, 538 F.3d at 533. The case simply presented no difficult ERISA questions for the Court to resolve.

Thus, this factor weighs against an award of fees for BMA.

**5.  *Relative Merits of the Parties' Positions*.**  The final factor in the fee analysis considers the *relative* merits of the parties' positions.  Since the Court only remanded the decision, neither party has, per se, prevailed.  This means that on remand, a full and fair review could result in BMA's claims being allowed at a higher rate.  Or the review could produce the opposite result.  Unfortunately, neither side included information in the administrative record that would allow the Court to advance an informed opinion about BMA's prospects of success on remand.  Nevertheless, this omission does not necessarily preclude a fee award.  Instead, the Court must look to the relative strengths of each party's position.

First, BMA's overcoming the deferential arbitrary and capricious standard of review indicates that its position had merit.  *Blajei v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 09-13232, 2010 WL 3855239, at *8 (E.D. Mich. Sept. 28, 2010) (citing *Andrews v. Prudential Ins. Co. of Am.*, No. 08-14391, 2010 WL 1257784, at *2 (E.D. Mich. Mar. 29, 2010); *McKay v. Reliance Standard Life Ins. Co*., 654 F. Supp. 2d 731, 739 (E.D. Tenn. 2009) ("The arbitrary and capricious standard is highly deferential to ERISA plan administrators . . . . [T]hat Plaintiff overcame this significant hurdle and achieved a remand to determine benefit eligibility means his position had significant merit, regardless of whether he is ultimately the prevailing party for purposes of the ERISA statute."); *Soltysiak v. Unum Provident Corp*., 480 F. Supp. 2d 970, 975 (W.D. Mich. 2007) ("The fifth [King ] factor . . . weighs in Plaintiff's favor.  Plaintiff obtained a reversal [and remand] of Defendant's denial of his claim.")).  But the cautionary language used in *Gaeth* counsels against a finding for the plaintiff on the basis of an arbitrary and capricious holding alone.  In *Gaeth*,

the Sixth Circuit recognized the incongruity of a situation where a party that ultimately wins could nevertheless be required to pay the attorney fees of the losing party. 538 F.3d at 534. While the possibility that a plan administrator might ultimately prevail is an important factor for consideration, *id.* ("But the possibility that Gaeth could receive attorney fees from Hartford even if he ultimately loses his case underscores the importance of carefully analyzing the relative merits of the parties' positions."), BMA has nevertheless overcome a highly deferential arbitrary and capricious standard of review, supporting the merits of its position.

For six years, BMA has contested the amount paid by CEB. But the data CEB relied on remains a mystery. Further, the administrative record revealed that CEB used an improper calculation method and failed to follow the Plan requirements for determining the UCR rate. Even without the benefit of an updated review, there is a substantial possibility that the UCR rate will be higher without the use of repricers who have an incentive to price claims lower to increase their own profitability. And although the new UCR rate may still fall below what BMA claims, any increase would support their view that the claims were originally priced incorrectly. This factor, therefore, weighs in favor of BMA.

*7. Conclusion.* In the end, BMA has demonstrated that CEB acted with culpability, that a fee award would have a deterrent effect on other plan administrators, and that the relative merits of the parties' positions favors an award. Even if CEB's ability to satisfy an award would have an impact on Plan assets and BMA did not seek to confer a common benefit, the pendulum still swings in BMA's favor. The party with the ability to rectify this situation, CEB, has not done so. At

any point over the past six years, it could have provided BMA with the data used, explained how it calculated the UCR rate, or relied on the actual Plan language for accepting or denying BMA's claims. It did not do so. BMA is now entitled to attorneys' fees.

### III. FEE CALCULATION

Both parties agree that the lodestar method is the appropriate method for calculating attorneys' fees. R. 133 at 9. The lodestar amount is simply the proven number of hours expended multiplied by a reasonable hourly rate. *Ellison v. Balinski*, 625 F.3d 953, 960 (6th Cir. 2010) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The Court's primary concern is in determining whether the fee awarded is "'reasonable,' that is, one that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (quoting *Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999)). Here, BMA requests $163,514 in attorneys' fees and $500 in costs. R. 132 at 13. However, neither BMA nor CEB has provided the Court with adequate documentation to assess the reasonableness of the requested fee.

First, Doug Gibson, attorney for BMA, failed to include *any* information about the hours spent in this litigation. In an affidavit, Mr. Gibson claims he is entitled to $137,500 at an hourly rate of $275, which translates into 500 hours of work over three years. R. 132-2 at 2, 4. Rather than list the time spent on any given task, he records the activities he undertook on various days and months. Mr. Gibson acknowledges this deficiency, blaming it on the fact that he undertook the case on a contingency fee basis and did not keep contemporaneous time records. R. 132 at 10. But if he cannot

accurately account for the time spent on each activity, it is not clear how he can expect this Court to perform that undertaking for him. There is simply insufficient information to "determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Imwalle v. Reliance Med. Prods., Inc*., 515 F.3d 531, 553 (6th Cir. 2008) (quoting *United Slate, Local 307 v. G & M Roofing & Sheet Metal Co*., 732 F.2d 495, 502 n.2 (6th Cir. 1984)). While an attorney need not record each minute of his time, *Hensley*, 461 U.S. at 437 n.12, he must provide enough detail to allow the Court to determine the reasonableness of the time spent on each task, *Cleveland Area Bd. of Realtors v. City of Euclid*, 965 F. Supp. 1017, 1021 (N.D. Ohio 1997).

So what is the Court to do? One option is to simply reduce the award. *Hensley*, 461 U.S. 424, 433 (1983). District courts may make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure. *Gates v. Deukmejian*, 987 F.2d 1392, 1398 (9th Cir. 1992). Another option in egregious situations is to disallow the award altogether. *See Comtys. for Equity v. Mich. High School Athletic Ass'n*, No. 1:98-CV-479, 2008 WL 906031, at *14 (W.D. Mich. March 31, 2008) (citing *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 952 (1st Cir. 1984)). When faced with a similar situation in *Cleveland Area Bd. of Realtors v. City of Euclid*, the court reduced the requested fee award by 10% to account for insufficient documentation. 965 F. Supp. at 1021 (citing *In re Olson*, 884 F.2d 1415, 1428 (D.C. Cir. 1989)) (reducing lodestar by 10% for insufficient documentation and excessive conferences); *Walker v. Coughlin*, 909 F. Supp. 872, 881 (W.D.N.Y. 1995) (15% reduction for inadequate documentation); *Conn. Hosp. Ass'n v. O'Neill*, 891 F.

Supp. 687, 691 (D.Conn. 1994) (10% reduction for vague entries); *Ragin v. Harry Macklowe Real Estate Co*., 870 F. Supp. 510, 520 (S.D.N.Y. 1994) (30% reduction for inadequate documentation and duplicative claims)).  The Sixth Circuit in *Black v. Lojac Enters., Inc*., No. 96-5654, 1997 WL 377051, *3 (6th Cir. 1997), upheld the district court's award of $25,424.12 in attorney fees, slashed from the requested amount of $193,282.34 for vague time entries and descriptions.  In *Helfman v. GE Group Life Assur. Co*., No. 06–13528, 2011 WL 1464678, at *8 (E.D. Mich. April 18, 2011), the court reduced the total fee requested by 20% for "block billing" and vague entries.  And the court cut 40% from the requested fees in *Healthcall of Detroit, Inc. v. State Farm Mut. Auto. Ins. Co*., 632 F. Supp. 2d 676, 685 (E.D. Mich. 2009), where the attorney provided a *post hoc* summary of time spent without contemporaneous billing records.

In light of these cases, the Court could reduce Gibson's fee by a percentage. But by what percentage?  Further, after doing so, it would still be impossible to say with "a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation."  *Imwalle*, 515 F.3d at 553.  Gibson clearly spent a significant period of time on this matter.  But he has not met his burden of producing a particularized billing record.  *Imwalle*, 515 F.3d at 553 (quoting *Perotti v. Seiter*, 935 F.2d 761, 764 (6th Cir. 1991) (explaining that the burden falls on the party requesting fees)).  The Court denies his motion without prejudice and orders that he submit a reconstruction of his hours to the greatest extent possible.  His time may still be subject to a percentage reduction for failure to provide this information in his initial motion.

The second problem lies with the hourly rates claimed by BMA's attorneys. James F. Bennett requests fees at an hourly rate of $400; Megan Heinsz requests $325 per hour; Jennifer Aspinall requests $310 per hour; and finally, Doug Gibson requests $275 per hour. R. 132-1 & 2. CEB challenges these rates based on BMA's failure to show that they are in keeping with those in the Eastern District of Kentucky. Unfortunately, neither party provided sufficient documentation to assist the Court in making this determination.

Determining a reasonable hourly rate first requires looking at the "'the prevailing market rate in the relevant community.'" *Adcock-Ladd*, 227 F.3d at 350 (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). The prevailing market rate considers the rate at which "lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record, rather than foreign counsel's typical charge for work performed within a geographical area wherein he maintains his office and/or normally practices." *Id.* (citing *Hudson v. Reno*, 130 F.3d 1193, 1208 (6th Cir. 1997)). The "relevant community" is Kentucky.

BMA offers one affidavit to establish the prevailing market rate in Kentucky: an affidavit from a 2008 case involving CEB's counsel's firm. R. 135-1. This affidavit states that the prevailing rate for attorneys in the Eastern District of Kentucky is as high as $350 an hour. *Id.* It also notes that one attorney's rate of $250 an hour was reasonable. Numerous problems challenge reliance on this affidavit. First, BMA offered it in its reply, meaning CEB did not get the opportunity to respond. Second, the affidavit does not make clear what experience or expertise level warranted the higher fee. Third, that case involved a Fair Labor Standards Act claim,

not an ERISA claim. *Crawford v. Lexington-Fayette Urban Cnty. Gov't*, No. 06-299, 2008 WL 4724499, at *1 (E.D. Ky. Oct. 23, 2008). Even if the same market rate applies for both types of cases, BMA offers nothing else to support this contention.

BMA also claims that its rates are reasonable based on each attorney's training, education, and experience regardless of the relevant community. R. 135 at 9-10. In particular, it notes that its rates are reasonable for Georgia and Missouri attorneys. If BMA seeks such rates, it must assume the burden to show that local rates should not apply. BMA must prove that (1) "hiring the out-of-town specialist was reasonable in the first instance," and (2) "that the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation." *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995) (citations omitted).

First, nothing indicates BMA ever attempted to locate competent counsel in the relevant market. *Id.* In response, BMA claims that it is unaware of any experienced attorneys in Pikeville who handle ERISA litigation. R. 135 at 9. But the venue of this Court is broader than the city of Pikeville. CEB provides no affidavits of its own countering this assertion. However, a quick review of recent cases reveals that a number of Kentucky attorneys practice ERISA law. *See Carter v. Guardian Life Ins. Co. of Am.*, No. 11-3, 2011 WL 1884625, 1 (E.D. Ky. May 18, 2011) (Pikeville and Louisville); *James River Coal Co. Med. & Dental Plans v. Bentley*, 649 F. Supp. 657 (E.D. Ky. 2009) (Louisville); *McCarty v. Trane*, No. 08-35, 2009 WL 511174, at *1 (E.D. Ky. Feb. 27, 2009) (Paintsville and Louisville); *Madden v. Am. Elec. Power Sys. Long-Term Disability Plan*, No. 08-26, 2009 WL 277447 (E.D. Ky. Feb. 5, 2009) (Hazard and Lexington). In *American Canoe v. City of Louisa*, 683 F.

Supp. 2d 480, 486 (E.D. Ky. 2010), both parties submitted affidavits from Kentucky attorneys—some from the plaintiff attesting to the absence of attorneys in the area equipped to handle the sort of litigation at issue, others from the defendant confirming that local attorneys could perform the work. Here, one affidavit has been provided and its applicability in this case is questionable.

Second, without more information, the Court cannot determine whether the rates sought are reasonable based on each attorney's skill, experience, and reputation. What is the reasonable rate for someone with Mr. Bennett's skill or Mr. Gibson's experience? BMA cites to *Murphy v. Fedex. Nat. LTL, Inc*., No. 4:07CV01247, 2009 WL 1939957, at *3 (E.D. Mo. July 2, 2009), where the court held that $400 per hour was reasonable for a St. Louis attorney, and *Capone v. Aetna Life Ins. Co*., No. 1:06-CV-3014, 2010 WL 6029242, at *8 (N.D. Ga. Dec. 22, 2010), where $425 per hour was reasonable for an Atlanta area attorney in an ERISA case. R. 135 at 9-10. But how did the experience of those attorneys stack up against the experience of the attorneys for BMA? BMA does not provide an explanation.

BMA's argument regarding its long-standing relationship with Dowd Bennett is more persuasive. The Court may consider, as one of a number of factors, the nature and length of the professional relationship with the client. *See Graceland Fruit, Inc. v. KIC Chems., Inc*., 320 F. App'x 323, 329-30 (6th Cir. 2008); *see also Johnson v. Ga. Highway Express, Inc*., 488 F.2d 714, 717-19 (5th Cir. 1974). While this fact supports BMA's position, standing alone it does not resolve the issue. BMA cites to *Graceland Fruit, Inc. v. KIC Chems., Inc*., but in that case the fact that out-of-state law applied and the cost of getting local counsel up-to-speed also factored into the

equation. 320 F. App'x at 329-30. BMA next points out that Dowd Bennett had experience in handling repricing litigation. That non-local counsel "possesses specialized expertise in the matter to be litigated" is a factor for consideration. *Sigley v. Kuhn*, No. 98-3977, 2000 WL 145187, at *7 (6th Cir. Jan. 31, 2000). But such reliance on the attorney's expertise does not begin and end the debate.

Once again, the Court faces a dilemma. It could rely on the one affidavit in the record and assume that is the prevailing market rate. Or it could deny the fee award without prejudice and allow the parties the opportunity to submit adequate information on which the Court can make a reasoned decision. The latter option is the better one.

## CONCLUSION

BMA has shown that it is entitled to fees, but it has not provided the Court with sufficient information to calculate the fee award with any accuracy. The Court cannot asses whether hiring an out-of-town specialist was reasonable (and what steps BMA took in deciding to hire that specialist). Nor can it say that the rates are reasonable for an in-town *or* out-of-town specialist. Therefore, the Court will grant BMA's motion for attorneys' fees but deny without prejudice the fee award so that both parties may submit additional information for evaluating the reasonableness of hourly rates claimed by BMA.

Accordingly, it is **ORDERED** that:

(1)     BMA's motion for attorneys' fees, R. 128, is **GRANTED**.

(2)     The actual fee award is **DENIED WITHOUT PREJUDICE**. BMA shall have until **Friday, August 26, 2011**, to supplement the record

with a detailed accounting of hours spent by Doug Gibson, as well as affidavits and any other relevant information to assist the Court in determining the appropriate hourly rates for the attorneys requesting fees. The response and reply shall be filed in accordance with the timelines forth in the Local Rules.

This the 15th day of August, 2011.

**Signed By:**

*__Amul R. Thapar__*

**United States District Judge**